IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | No. CR 10-3463 JB |
| vs. | ) | |
| **EDDIE CHACO, JR.,** | ) | |
| Defendant. | ) | |

UNITED STATES' RESPONSE TO DEFENDANT'S
OPPOSED MOTION FOR A DAUBERT HEARING (Doc. 38)

The United States of America responds to the defendants's Opposed Motion for a Daubert Hearing (Doc. 38) as follows:

FACTS

The Defendant stands charged with three counts of Aggravated Sexual Abuse, occurring on or between August 2008 and May 2010, in violation of 18 U.S.C. §§ 1153, 2241(c) and 2246(2)(D). The victim, Jane Doe, who is the defendant's daughter, was under the age of 12 during all relevant times in the indictment. On June 30, 2010, a forensic interview was completed with Jane Doe during which she disclosed that for the prior two years, while she was seven and eight years old, the Defendant touched her in various sexual ways. For example, she disclosed that he would sometimes "sneak" up on her as she slept at night, take off her blankets, and turn her over. On various occasions, the Defendant would ask that she touch his "private" part and would "put his private part in her private part." On other occasions, he would "lick her private part" and take off her bra and touch her "there."

These encounters occurred most frequently in a one-room building located on the defendant's parents's property that served as the defendant's makeshift bedroom. She disclosed

that all of the instances took place when no one was around and would end upon her starting to cry. On each occasion, according to Jane Doe, the Defendant was intoxicated. With regard to a frequency of these encounters, Jane Doe estimated that it occurred approximately 10 different times.

On or about November 4, 2010, Dr. Renee Ornelas, a pediatrician and expert in child sexual assault examinations, performed a physical examination and evaluation on Jane Doe. Dr. Ornelas will testify that Jane Doe gave a clear, graphic description of sexual abuse perpetrated by the defendant. In particular, Jane Doe described contact by the defendant to her "chest, front (genitals), and butt" by his hands. Jane Doe further described penile-genital and digital-genital contact by the defendant. Moreover, Jane Doe described ejaculate and where it made contact with her body.

Dr. Ornleas will additionally testify that the physical examination of Jane Doe yielded normal results. In other words, she observed no physical injury on or around Jane Doe's genitalia. Such a result, however, is normal and expected given the types of contact Jane Doe described and the time lapse separating the incidents and the examination. In other words, Dr. Ornelas will opine that the results of the physical exam neither confirm nor invalidate the allegations as set forth in the indictment. In fact, Dr. Ornelas will explain that most physical examinations of sexually abused pre-pubertal girls result in normal examination findings.

ARGUMENT

In response to this anticipated testimony, on July 26, 2011, the defendant filed a *Daubert* motion requesting judicial review of Dr. Ornelas's testimony (Doc. 38). This bare-bones motion is problematic for the defendant in several respects. First, and perhaps most troubling, it is built,

in part, on a false premise. The defendant claims that "[i]n essence, Dr. Ornelas's testimony will be that, in her expert opinion, Mr. Chaco sexually abused Jane Doe." Defendant's Motion at pgs. 1-2. Dr. Ornelas will testify to no such thing. In the United States' Notice of Intent to Introduce Expert Witness Testimony (Doc. 27), it set forth the nature and extent of the opinions Dr. Ornelas will offer at trial, namely that the results of the physical exam neither confirm nor invalidate the allegations set forth in the indictment. Nothing in that Notice claims, or even intimates, that Dr. Ornelas will opine that, in her opinion, Mr. Chaco sexually abused Jane Doe. To hammer that point home, on July 25, 2011, a day before the defendant filed the instant *Daubert* motion, the United States affirmatively stated that "it will not ask any question regarding Dr. Ornelas's opinion as to whether the victim had been sexually abused." Doc. 37 at pg. 3. Thus, the defendant's premise is one manufactured out of thin air; it is a classic strawman argument in that it purposely misrepresents the government's position then seeks to refute it. In the end, it offers the defendant no traction in his pursuit to suppress Dr. Ornelas's testimony.

Once the court gets past this thinly-guised strawman argument, the gist of the defendant's motion boils down to this: "Because Dr. Ornelas cannot confirm or validate the allegations set forth in the indictment, this Court should address whether her testimony is admissible." This, however, is not the stuff of a *Daubert* claim. Indeed, in the course of making the argument, the defendant neither questions the qualifications of Dr. Ornelas nor raises any claim regarding the underlying science and/or methodology that supports the opinion, both or which are at the heart of any well-crafted *Daubert* attack. Rather, the defendant's argument, although styled under *Daubert*, is simply a run-of-the-mill relevancy objection. In other words, the defendant does not argue that the opinion is inadmissible because it is built on bad science, but rather because it does

not "confirm or validate the allegations set forth in the indictment." The defendant may not pin the relevance label to this objection, but, in reality, that is all that it is.

The Court need not labor long in denying the unarticulated relevance claim. Dr. Ornelas's testimony is perfectly relevant because will add flavor and texture to the trial. It will provide the jury with insight into the scope of the investigation that led to this moment. It will answer questions such as: What was done to investigate? Who investigated? What results were obtained during the course of the investigation? What do these results tell us? To be sure, without Dr. Ornelas's testimony, the jury will be left to wonder in a vacuum about these questions and, perhaps, unjustly punish the government for not performing an investigation that was in-fact conducted. Because the defendant's claim amounts to a simple relevancy objection, and because the proffered evidence is perfectly relevant, the Court can end the analysis right here and deny the claim without need for an evidentiary hearing.

Although the defendant fails to set forth any real *Daubert* claim in his motion, and, in fact, fails to raise any issue whatsoever regarding the science or methodology employed by Dr. Ornelas, the United States will nevertheless address the law of expert testimony and how it applies to this case. In so doing, however, the United States reserves the right to amend and supplement its argument should the defendant, at some point prior to trial, sharpen his *Daubert* focus.

<u>The Law of Expert Testimony</u>

Federal Rule of Evidence 702 provides that an expert may testify "in the form of an opinion or otherwise" if his or her "specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Under Rule 702, district courts must act as

"gatekeepers," admitting expert testimony only if it is reliable and relevant. *See Daubert,* 509 U.S. at 589. Accordingly, the party offering the purported scientific testimony must demonstrate that it represents "scientific knowledge" or the product of scientific reasoning or methods. *Id*. at 592-93.

In undertaking the latter inquiry, the Court articulated a list of nonmandatory and nonexclusive factors district courts can consider in determining the admissibility of scientific evidence: (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review and publication; (3) the known or potential error rate of the technique or error rate when applied; (4) the existence and maintenance of standards and controls; and (5) whether the method is generally accepted within the relevant scientific community. *Id*. at 592-96 (envisioning flexible analysis when applying above factors).

*Daubert* marked a shift in American jurisprudence from the stringent "general acceptance" test announced in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) to the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 587. In *Daubert*, the Court held that the rigid and restrictive "general acceptance" test had been superceded by adoption of the Federal Rules of Evidence, and that the *Frye* formula was incompatible with the liberal precepts of Rule 702. *Id*. at 585-88. The Court cautioned, however, that Rule 702 does not extend *carte blanche* to litigants to present unorthodox or unproven theories to juries as established "science." As the court noted, the text of Rule 702 itself calls upon the trial court to act as the gatekeeper to screen purported scientific evidence for reliability. *Id*. at 589-90.

A decade ago, Rule 702 was amended in the wake of *Daubert*.[1] The amendment affirms *Daubert's* core holding setting forth the trial court's role as a gatekeeper and the holding in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) that all types of expert testimony present questions of admissibility for the trial judge.  The combination of *Daubert* and Rule 702 now requires the court to examine "not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." *See* Fed.R.Evid. 702 advisory committee's note.

In addition to the three stated requirements under former Rule 702 (type of knowledge, witness qualification, and helpfulness to the jury), amended Rule 702 now requires that three additional tests be met before opinion testimony can be admitted.  First, the court must find that the expert testimony is based upon sufficient "facts or data," terms borrowed from Rule 703.  The last two requirements encompass *Daubert's* concerns that an expert's opinion be based upon reliable theory and methodology, and that the theory and methodology have been reliably applied to the instant case.  Although the amended rule does not attempt to codify the specific factors set forth in *Daubert*, the standards in subparts (2) and (3) of the Rule are broad enough to require the court to consider any or all of the *Daubert* factors as appropriate, as well as other factors relevant in determining the reliability of expert testimony.  *See* Fed.R.Evid. 702 advisory committee note

---

[1] Rule 702, as amended, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

(noting five other factors courts have found relevant in determining whether expert testimony is sufficiently reliable to be considered).

      With respect to other factors courts can consider in determining the admissibility of Rule 702 evidence, the advisory committee listed the following as relevant to the inquiry: (1) whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." (citing *Daubert*, 509 U.S. at 1317); (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered")); (3) whether the expert has adequately accounted for obvious alternative explanations. (citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiffs condition)); (4) whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." (citing *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)); and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. (citing *Kumho Tire,* 521 U.S. at 151 (*Daubert's* general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.")).

<u>Dr. Ornelas is a Highly-Qualified Pediatrician and Child Sexual Assault Examine</u>

As is reflected in the *curriculum vitae* the government has disclosed to the defendant. Dr. Ornelas is in her twenty-eighth year of practicing medicine, nearly all of them devoted to child sexual assault victims. At various times in her distinguished career, she has been a pediatric sexual abuse consultant, a child sexual abuse medical examiner, a pediatric emergency room physician, a professor, a prolific author and lecturer on the topic of child sexual abuse, the treating physician for countless child sexual assault victims, and, currently, the director of Para Los Niños, a clinic the focuses exclusively on the medical needs of suspected victims of child sexual abuse. One might ask if Dr. Ornelas is not qualified to offer expert medical opinions related to child sexual abuse, then what doctor is?

<u>Application of *Daubert* to Dr. Ornelas's Opinions</u>

As stated above, Dr. Ornelas will testify that she performed a child sexual assault examination on Jane Doe and found no abnormalities. This result, however, is not uncommon. In fact, Dr. Ornelas will explain that *most* child victims of sexual assault present with no detectable physical injury. Further, Dr. Ornelas will explain that the reason that most examinations of sexually abused prepubertal girls result in normal examination findings is due to the elasticity of the hymenal tissue and rapid healing of any injuries that may have occurred during the sexual abuse. In layman's terms, most young victims do not suffer physical injury as a result of a molestation, and, those that do tend to heal quickly. It is the exception, not the rule, to find physical injuries on a child. The "facts and data" used by Dr. Ornelas to reach this result stem from the physical examination she herself performed.

The opinions of Dr. Ornelas in no way place her as an outlier in the relevant medical community. To the contrary, the general censuses in relevant medical community, as is reflected in a mountain of literature, is in perfect accord with what Dr. Ornelas will tell the jury. *See*, *e.g.*, Joyce A. Adams, M.D., Katherine Harper, PA-C, Sandra Knudson, PNP, Juliette Revilla, EXAMINATION FINDINGS IN LEGALLY CONFIRMED CHILD SEXUAL ABUSE CASES: IT'S NORMAL TO BE NORMAL, 94 *Pediatrics* 310 (1994); Jim Anderst, Nancy Kellog, and Inkyung Jung, REPORTS OF REPETITIVE PENILE-GENITAL PENETRATION OFTEN HAVE NO DEFINITIVE EVIDENCE OF PENETRATION, *Pediatrics* (published online Aug. 3, 2009); Astrid Heppenstall-Heger, Gina McConnell, Lynne Ticson, Lisa Guerra, Julie Lister, Toni Zaragoza, HEALING PATTERNS IN ANOGENITAL INJURIES: A LONGITUDINAL STUDY OF INJURIES ASSOCIATED WITH SEXUAL ABUSE, ACCIDENTAL INJURIES, OR GENITAL SURGERY IN THE PREADOLESCENT CHILD, 112 *Pediatrics* 829 (2003); S. JEAN EMANS, ELIZABETH WOODS, NANCY FLAGG, AND AMANDA FREEMAN, GENITAL FINDINGS IN SEXUALLY ABUSED, SYMPTOMATIC AND ASYMPTOMATIC, GIRLS, 79 *Pediatrics* 778 (1987); Martin A. Finkel, ANOGENITAL TRAUMA IN SEXUALLY ABUSED CHILDREN, 84 *Pediatrics* 317 (1989). In sum, there is nothing controversial about what Dr. Ornelas will relay to the jury; it is generally accepted medical truth.

A *Daubert* hearing is unnecessary in this case.

A *Daubert* hearing is unnecessary in this case. As has repeatedly been made clear, while the gatekeeping function requires the district court to ascertain the reliability of an expert witness's methodology, it does not necessarily require that a separate hearing be held in order to do so. *Kumho Tire*, 526 U.S. at 152 (district courts possess "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are

needed to investigate reliability"); *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999) (pre-trial hearing on chemist testimony not required because "the challenged evidence does not involve any new scientific theory and the testing methodologies are neither new or novel"); *United States v. Williams*, 506 F.3d 151, 161 (2nd Cir. 2007) (separate hearing not necessarily required to determine the reliability of methodology); *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that inquiry into reliability must take . . ."); *see also United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) ("Under Daubert, a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered). In fact, if a given theory or technique is 'so firmly established as to have attained the status of scientific law,' then it need not be examined at all, but instead may properly be subject to judicial notice); *United States v. Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (denying defendant's request for pre-trial evidentiary hearing with respect to, among other things, fingerprint expert testimony). There simply can be no question that the field of child sexual abuse examinations, and the conclusions gleaned therefrom, enjoy universal acceptance as a valid and reliable forensic science. For that reason, expert testimony concerning the nature, extent and consequence of injuries, or lack thereof, is widely accepted and routinely admitted. The defendant does not cite a single case, federal or state, in this jurisdiction or elsewhere, in which expert testimony of this type was excluded. Thus, a *Daubert* hearing is unnecessary.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests this Court allow Dr. Renee Ornelas's above-described expert testimony to be offered in the government's case-in-

chief at trial in this matter and that the Court find that the proposed testimony of this witness has a "reliable basis in the knowledge and experience" in his specialized field, and is therefore admissible.

                              Respectfully submitted,

                              KENNETH J. GONZALES
                              United States Attorney

                              **Filed electronically on 7/31/2011**
                              Jack E. Burkhead
                              Assistant United States Attorney
                              P.O. Box 607
                              Albuquerque, NM 87103
                              505-346-7274

I HEREBY CERTIFY that I filed the foregoing pleading electronically through the CM/ECF system which caused counsel of record to be served by electronic means, as reflected on the Notice of Electronic Filing, and other methods of service as indicated therein on July 31, 2011.

       /S/
─────────────────────────────
Jack E. Burkhead
Assistant United States Attorney